We will now take up National TPS Alliance v. Christy Noem in the Department of Homeland Security. You may proceed, Counsel. Good morning. May it please the Court, Drew Ensign, Deputy Assistant Attorney General for the United States. I'd like to reserve four minutes for rebuttal. Yes, and please watch your clock. Thank you, Your Honor. As the Supreme Court has already implicitly recognized by an exceptionally lopsided vote, the government is likely to prevail on appeal here, either in this court or, if necessary, in the Supreme Court. This court should follow the Supreme Court's lead and reverse. This case should begin and end with jurisdiction. Congress has gone out of its way to enact an exceptionally broad prohibition on judicial review, providing that, quote, there is no judicial review of any determination of the Secretary with respect to the designation or termination or designation or extension of a designation of a foreign state under the subsection, end quote. The language has two features that make it particularly broad. First, it employs the adjective any to modify determination, and second, it applies to any determination, quote, with respect to the designation or termination or extension, end quote, and not merely terminations and extensions themselves. This language is exceptionally similar to Patel v. Garland, which held that a statute barring review of, quote, any judgment regarding the of relief, end quote, covered, quote, any authoritative decision, end quote, on the matter. Similarly, this court's decision in Reeb v. Thomas that Congress's exclusion of APA review of, quote, any determination, decision, or order, end quote, of the Bureau of Prisons barred review even in the habeas corpus context. So here, the Secretary's vacator of Secretary Mayorkas' 11th hour extension of TPS status falls squarely within Congress's prohibition of judicial review. It was a, quote, determination, dot, dot, dot, with respect to, dot, dot, dot, and extension, end quote, of TPS status. It is squarely within the heartland of the jurisdictional bar that Congress has enacted. So what couldn't the Secretary do with respect to that? You can see the vacators nowhere in this statute. So any determination with respect, if this is a determination with respect to an extension, what isn't? Your Honor, I mean, certainly this is very broad language. And just to be clear, I don't think we concede that vacator isn't in the statute. We think it's implicit in the grant of authority. In the, let's, we'll be textualist for a second. In the text of the statute? Your Honor, I think the effect of the text of the statute when combined with background principles. Understood. Okay. Thank you, Your Honor. Your Honor, it is going to, it is exactly as Congress intended. Anything with respect to determination. Now, there may be edge cases. The Supreme Court does have the kind doctrine that is recognized and reiterated a couple years ago where, where, where something is extraordinarily and like blatantly ultra-virus. Sometimes you can get judicial review even in the teeth of a prohibition. Let's have an example of a determination that grants perpetual protected status. Your Honor, I think that potentially could fall within the kind exception. But notably here, plaintiffs have not, have not attempted to invoke or even acknowledge that doctrine. But there, there is a, the Supreme Court has devised that sort of safety valve for extraordinary cases like that. But we're not, we're not only not here, it's not even being argued here. And, and more generally, when Congress enacts a very broad prohibition on judicial review, that's Congress's determination that, that these matters are reserved to the political branches. If the executive does something that is beyond the pale, such as like a perpetual extension, Congress recognizes that, that, you know, they can certainly step in to correct that. Isn't the, I'm sorry. No, go ahead. Isn't the first claim alleged that the Secretary overstepped her authorization, statutory authorization by vacating a prior grant of TPS? Yes, that, that is the nature of their claim. But that is not the sort of thing that would fall within kind. Kind is the sort of more like what Judge Johnstone was referring to, where it says you can only grant an extension for up to 18 months and you grant one that's perpetual. It has to be something that is egregious and, you know, beyond the pale. And again, plaintiffs have not even attempted to invoke such an extension. But, but this is just the other side of this infinite spectrum. The Secretary is essentially saying that it's granted for zero days. I don't believe so, Your Honor, for a couple of reasons. I mean, I think what we have here is you have a background principle of administrative law that everyone acknowledges that as a general matter, agencies have authority to reconsider their decisions as long as they do so in a timely manner. And timeliness is not remotely contested here or, frankly, contestable. So what you have is a disputed inference about text, which is not the sort of like patently ultra-virus. It is a ordinary dispute about agency authority, where even they admit that, you know, two things that I think are interesting. You know, on page 39 of their brief, they say, no doubt the Secretary has authority to correct inadvertent ministerial errors. So they're already admitted that, admitting that the Secretary has some authority to reconsider. Is this an inadvertent or ministerial error? It seems like it's not. No, Your Honor, but I think that concession is important because it recognizes the existence of some authority and we're just fighting about the extent of it. I wouldn't the existing authority lead us to the same place as at least where we landed in the Ramos case. I understand it's vacated, but working with the same sources, it seems like the line that they drew would have placed this on the side of reviewable. Your Honor, I don't think so. Obviously, you've acknowledged that it is not binding authority, but the Ramos case did acknowledge the authority to do this and it also said that, recognized that it precludes direct review of the Secretary's country-specific TPS determinations. But if the Secretary exceeds the statute but only does it, well, once, why does that make it a country-specific determination? Because it's a determination with respect to one country. The fact that it was vacated presumably is a power that could be exercised with respect to anyone. It wasn't vacated because, even with respect to the vacator notice itself, it wasn't vacated because of anything about Venezuela. I think that's correct as to the vacator, the rationales given. And if the Secretary loses on vacator, we don't need to reach the terminations, right? Your Honor, let me clarify that first thing and then circle back to it. I thought you might. Go ahead. It is very country-specific in that what Secretary Mayorkas did was incredibly country-specific. It revolves around Venezuela and nothing else, and this is a vacator of it. I don't think there's any reasonable way to understand the vacator of a country-specific decision as itself being anything other than country-specific. It was country-specific, your argument is. It was country-specific because of the consolidation and realignment of the process because it was merging, in some ways, these two Venezuela TPS determinations. I think that's part of it, your Honor, but just more simply, it's country-specific because it is specific to one country. So the Secretary gets one bite at the apple or a mulligan with respect to exceeding the statute, but if it applied to more than one country, then we might be talking about jurisdiction. Your Honor, we certainly disagree with what Ramos held, but I think that Ramos did recognize some room for the sort of programmatic and more overarching challenges. I think that, you know, we think that's wrong, we decided, but we also don't think that's necessarily a reach here because this is a country-specific determination. And in that way, it's also, unlike McNary, it is not a programmatic challenge. It is a challenge to a specific country one. It is directly within the heartland of what Congress has prohibited. Again, it is quite literally a determination with respect to an extension. That is the exact language that Congress used. That's why it's prohibited. I think that's why the Supreme Court was so lopsided in its vote. I mean, that's, of course, we don't know definitively what merits grounds they reach, but I suspect that was not a small part of why. Well, this may be a good segue, then, to something the Supreme Court had said earlier, that it's important that we receive genuine justifications for important decisions, in this case, from an agency. And so, as we look at the justifications, again, on the second APA challenge, the terminations contain some report to contain national security, maybe not national security, but public safety justifications. And I'm just wondering, given the seriousness of that, whether the administration has moved to exercise its power to withdraw TPS status from anyone, which is an alternative it can take, if it's worried about the public safety threat that particular TPS recipients may pose. Your Honor, I don't know specifically if they've tried to do so in individual instances. It's obviously a programmatic challenge. I wouldn't be surprised if they have done so, but candidly, I don't know. Do you concede that under the statute, and then under 8 CFR 2414, that the Secretary can withdraw on an individual basis, even with respect to admissibility grounds that arise after the grant of status? That is an additional tool that Congress has specifically provided to the Secretary that is not to the exclusion of her authority. Then how does that bear on whether the Secretary's action was arbitrary or capricious or whether the justification was sufficient if we don't even know whether the Secretary has exercised preexisting authority to address particular public safety threats posed by recipients of TPS? Several responses to that, Your Honor. I think, first of all, given that the numbers involved here, there's not really an intersection between individual determinations and an overarching program. There's no suggestion that the Secretary could exercise her discretion in hundreds of thousands of cases in a way that would somehow supplant or render a feasible alternative. What is, in fact, a duty imposed on her by Congress, it is not merely that she may terminate TPS status when it no longer meets the statutory requirements. Congress commanded that she shall terminate it. So even that existence of alien-specific authority does nothing to either diminish her authority or the congressional command. Can you point me to the statute and specifically the language that you're indicating that gives the Secretary the authority to terminate a prior designation of TPS status? What specific language to the statute are you pointing to? We're not pointing to specific language, Your Honor. It is a bedrock and well-established principle of administrative law that this court is recognized in CUA and essentially every circuit court is recognized in a very long string site we've provided. The courts have inherent authority to reconsider, or sorry, not courts, that agencies, forgive me, have inherent authority to reconsider their decisions as long as it's done in a timely manner. But when Congress has specifically limited the time period of the kinds of designations and the extensions that can be provided, doesn't that counter your argument? Here, Congress has specifically said, hey, we will give you this authority for this period of time and really only this period of time. Your argument is like, no, no, no, we still have, the Secretary still has the authority to change what Congress's grant is. Your Honor, I don't believe so. While the statute does provide a mechanism for termination, it does not speak to vacator whatsoever. And indeed, I believe there's a concession in their answering brief that the statute is silent as to vacator. And where a statute is silent on the matter, the default principle of administrative law kicks in and the agency retains its authority to reconsider decisions as long as it's done so in a timely manner. And again, timeliness is not challenged. Why isn't this, I mean, I think that, isn't that a statute-specific inquiry? Your Honor, it is a default principle that then turns on a statute-specific inquiry to see if an exception to that default principle would apply. And we have, as I understand it, this statute was enacted against a backdrop of congressional concern about the executives, about the executive having too much discretion with respect to both the selection of deferred enforcement and other executive actions, as well as the duration of those. Your Honor, I disagree with that premise for two reasons. First of all, this was enacted against a backdrop that, as the D.C. Circuit recognized, that previous sorts of discretion for temporary status was unreviewable under the APA. And Congress enacted against that backdrop this very specific jurisdiction-stripping statute. So I don't think- Counsel, has any administration ever, since the enactment of the statute, done exactly what this administration done, which is take away a prior designation of TPS status? Not specifically, Your Honor, but the prior administration did, in fact, exercise reconsideration authority to vacate a prior cancellation of status. And I think that's important, too, because, as my second answer to Judge Johnstone's question was, the statute is fundamentally different in a second way. It doesn't, it constrains discretion, but it does so in a very specific way. It says that the- Just to be clear, the answer is no. This never happened before. Your Honor, no, that we've never, the reconsideration authority has been exercised before. No, it has not been exercised in this specific manner before. Thank you. But it absolutely has been exercised before. And a week after, so the timeline here is troubling because my, Secretary Mayorkas extended the 2023 designation and consolidated 2021 and 2023 on January 17, 2025, and the new secretary, I don't know when she was even confirmed, but took action to revoke that about two weeks later. That's, I mean, how can the conditions, country conditions have changed so drastically in that two-week period? Your Honor- How could the review by the new administration have been done so quickly? I guess several responses to that, Your Honor. First of all, as Justice Rehnquist's concurrence in the State Farm case recognizes, administrations have different priorities and they are allowed to weigh evidence differently. As to the specific- Explanation for their changing position. Yes, Your Honor. And I think it's important on that arbitrary and capricious claim, because I think what's particularly notable is that the secretary gave many reasons and the district court, neither the district court nor Applebee's answering brief even touches one which would be fully sufficient to justify the vacator. Specifically, Secretary Nome explained that the explanation for the operative impacts of the extension was, quote, thin and inadequately developed, end quote, and the vacator was warranted to untangle the confusion. The district court never addressed that specific rationale that the prior explanation was thin and inadequately developed, and you will also not find any discussion of that in the answering brief. But if that were grounds for the invalidity of Secretary Mayorkas's extension, could not someone sue and change? I mean, in other words, you're suggesting it was something like arbitrary and capricious or otherwise didn't comply with the statute. The legal merits of it, and I think this is one of the teachings of the Supreme Court's decision in the Regent's case, is let that be litigated. If it's a legal concern, have the lawyers deal with it. But what you can't do is disguise that as a policy reason when there's not otherwise authorization to do so. Well, I think a couple of responses to that, Your Honor. I mean, generally, you could litigate it, and of course, there's a specific jurisdictional bar here. But second, they have attempted to litigate it, but they haven't attacked that rationale as protectional. You can't ignore entire independent bases for what the Secretary does and then say we won on an arbitrary and capricious challenge. Well, but, you know, the other troubling aspect of this, and I think it's worth mentioning, the statements by the Secretary and, frankly, by the President, but the statements by the Secretary saying specifically the Venezuelans purposely emptied out their prisons, emptied out their mental health facilities, and sent them here. Don't these seem to be, and I'm not going to get into all the different other statements that were her, but by the administration, aren't, what do we do with those statements? What do we do with, in terms of this decision to have been done about two weeks after they came in? Your Honor, I think you would, what you should do with them is approach them as the Supreme Court did in the Trump versus Hawaii case, where they are, you know, made prior to when people are in or a remote in context from the decision at issue. They are not, you know, they do not control the equal protection analysis. That's precisely how the Supreme Court addressed that in Trump versus Hawaii. You know, the vast majority of Secretary Nome's statements refer to before she was in office. I believe all of the statements of President Trump refer to when he was either campaigning or when he was in office the first time, which is, you know, very remote in time. And so, I think you should approach them as the Supreme Court has directed lower courts to approach them, that those sorts of statements do not make out a equal protection claim. And I think, you know, more than just that, I think only rational basis review here applies. I think that also comes out of the Hawaii case, and I think that comes out, not just the Hawaii case, but in particular, direct the court to Hawaii, Matthews, Mandel, and Heracides. I think all of those cases are very important to establish why rational basis review applies here. My friend has given two other reasons why it shouldn't, and I think both of them do not apply. The first is that they say that rational basis shouldn't apply for aliens already in the United States, but the Hawaii court already rejected that by citing to the Matthews case where it was an equal protection clause challenge to people already in the United States, and so doing it, recognize that rational basis applied to that. Mr. Enzina, I guess even under rational basis, if animus were the rationale for the action, it would still render it constitutionally suspect. I take your briefs to disavow any such purposes of the secretary's action here. We certainly disavow and deny any sort of animus. We also don't think that those statements are relevant to the right inquiry, as the Supreme Court made clear in the Hawaii case. The relevance question is whether there is a, sorry, it's facially legitimate and bona fide reason, and you look to the document itself, and where that inquiry is satisfied, as it was in the Hawaii case, that's the end of the equal protection analysis. Finally, just on rational basis, if I could, this court also has binding precedent on this, and I'm going to butcher the name of this, but the Manascus case says that when challenged under equal protection, line-drawing decisions made by Congress or the president in the context of immigration and naturalization must be upheld if they are other cases to the same effect. So for all of those reasons, we think the rational basis applies. How do we get around our regent's decision? I guess we can debate whether it's law or not, but I believe that we've suggested that Arlington Heights is the appropriate standard to review claims of animus in making immigration policy. Your Honor, I disagree for two reasons. First of all, in Regents, they merely assumed that the evidence failed under it. That's not a holding that it did apply. It's simply a, essentially, sidestepping of, like, even if you think the more rigorous standard applies, your evidence isn't good enough, so we don't need to resolve that question. And second, the Supreme Court, you know, relied on the Matthews case, which rejected, you know, it did involve an animus claim below by district court and nonetheless applied the rational basis review in Matthews, and then that was again cited as favorable authority in Hawaii and in any case remains good law of, you know, the Supreme Court. Thank you, Your Honors. Good morning, Your Honors. Ahilanar Alanandam from the UCLA Center for Immigration Law and Policy for Plaintiff National TPS Alliance and the Individual Plaintiffs. I'm certainly prepared to talk about jurisdiction and also appellate jurisdiction, but I feel obligated to begin by correcting the statements that were just made about the context of the Secretary's statements of animus, the judgment, those I was talking about. The vacatur happens three days after she comes into office, and the next day she goes on Fox News to give an exclusive interview, and she says, she calls the Venezuelan, you know, refugee community as a whole, dirtbags. Three days after that, she issues the termination, and that's an interview where she's explaining to the public the reasons for the decision that just happened. If you look at the context, this is docket 67-1, you can see we have a chart that lays this out. It's very clear that she's talking about that decision, explaining it, and this is what she says. Three days later, the termination happens, not a very long time, Your Honor, and she goes again on Meet the Press to talk about this, and she says, I'm quoting now, the TPP program has been abused, and then she talks about the connections to gang activity, and then she says, remember, Venezuela purposely emptied prisons and mental health facilities and sent them to the U.S., so we are ending that extension of that program. So it's the justification given to the public for this decision the day after the decision was made, and what the evidence that we presented, uncontested, is that there is a fact. Their point is we shouldn't consider that. Their point that she wasn't in office, I think, at the time. Yeah, that's wrong, Your Honor. This is after she's made the decision. It's the day after she made the termination decision when she went on TV to explain it, and that's why they keep saying, remote in time, and I don't know what they're talking about. There are three statements. There's these two. The other one, which is also a very clear expression of animus, happens in her congressional testimony. It's before she's confirmed, but it's 10 days before she's confirmed, and she's talking about the extension of TPS for Venezuela, and she says the extension of TPS for these 600,000 people, Venezuelans, is alarming because, and then she talks about this gang activity in Colorado that may be harming people. What the district court found, undisputed in the record, that there's no evidence that any TPS holders were in Colorado. The Colorado issue itself has been debunked. There's just a few incidents we're talking about, and this is why the district court found that this is the classic example of racism. It's taking a negative stereotype about a small number of people and generalizing it across the entire community, and so to claim that this is remote in time or that these statements are unconnected to the actual performance of the duties is just completely false. Mr. Aldon, do we have to reach the equal protection issues if we rule in your favor on either of the APA claims? No, absolutely not, Your Honor, and I'm happy to flip back over and start talking about it. I wonder whether you have any more information than your friend did with respect to the withdrawal authority, so at least as to the second claim, where we're looking to see whether there's any other options to address with the agency's policy concerns. Do you also agree that there is individual withdrawal authority for anyone the Secretary determines, in fact, is now inadmissible? Yes, Your Honor, that authority is clearly in the statute to withdraw TPS on an individualized basis if there's a finding that the person, either is a national security threat or if they've committed even two misdemeanors or a single felony. Are you aware of that authority being exercised at all by the administration? In a couple of cases, Your Honor, so I know in some of the cases that came out of the AEA, the Alien Enemies Act invocation and there were detentions of people, I litigated a couple of them, but you know, the ones I know about is like two or three cases. But with respect to beneficiaries of the Venezuela TPS? Yes, Your Honor. So that authority is there and can be used? It is, Your Honor. And I think this speaks also to the point, and I will talk about the APA claim, but just, you know, sort of connecting the dots here. The statute allows for individualized determination that someone presents a national security threat or has engaged in criminal activity. It quickly renders them ineligible because, as I said, a single felony or two misdemeanors renders you ineligible for TPS. And that makes sense if there's an individual person who has engaged in activity that's not, you know, criminal or not protected the security of the United States, and there can be an individualized withdrawal. It's very different to do it for 600,000 people. Can you address the APA claim, arguing that what was done here exceeded the authority of the Secretary? Yes, Your Honor. So should I start with the jurisdictional aspect of that? So now they seem to be arguing that there's sort of an implicit beyond the pale exception. If there is such an exception on their own account, I would argue that we fit it because, as Your Honor said, in the 35-year history of the TPS statute, there has never been before been a vacatur of a TPS extension. And also, you were asking about the statutory authority that this appears to violate. If you look at subsection B3b of the statute, it clearly states that a termination shall not be effective earlier than either 60 days before the notice or if later the expiration of the most recent previous extension under subparagraph C. So what the statute makes clear is that once an extension has been granted, it has to last for the whole time of the extension. Well, your opposing counsel makes the argument that the administration, a new administration. How does that apply here? I think whether or not an agency has such authority is always a product of the statutory framework itself. Agencies aren't given authority sort of by some magical common law. All agencies are creatures of statute, magical common law in this context. They're creatures of statute, and the case law is very clear about this. So you have to look at the statutory scheme under China Unicom, under Gorbach v. Reno, and similar Supreme Court cases. Well, they argue that sometimes there are these mistakes that are made within the agencies and that you have conceded that if they have that authority, why wouldn't they have this particular authority? Yes, the distinction between clerical errors or ministerial errors and policy preferences is very long-standing in the APA law. It goes all the way back to American trucking in 1958 and has been repeatedly recognized. So on the one hand, even if there's no other rescission or vacatur or revocation authority, there's authority to correct typos, you cite the wrong provision, you put the wrong date, and it's a factual question whether such a mistake has occurred, and that can be litigated. That's always available because mistakes happen, and of course, agencies to function have to be able to correct accidents. On the other end of the spectrum is policy disagreement, exactly what Judge Wardlaw was mentioning. They say, oh, well, we don't like what they did. We want to do it differently, and that is not always given. Whether or not that authority exists or not is a function of the statutory scheme, and this is a scheme that was designed to give stability to some amount of certainty for refugees in the face of the pre-existing regime, which allowed entirely unreviewable discretion. And so when he says... I don't understand in these proceedings or elsewhere, and I asked your friend about this too, any kind of legal errors or APA irregularities that have been assigned to Secretary Mayorkas's decision. There's been a lot of discussion about, there's this question about, well, maybe they didn't line up or anything, but has there been any allegation that determination was illegal contrary to law? No, Your Honor, and I want to talk about that 21-23 consolidation issue in a moment, but to answer your question, no. They sort of gesture at it, it might be illegal, but they don't just come out and say that determination was legal error, and of course, if they did, then that would be reviewable. It would be a legal conclusion of the agency that would itself be reviewable under very long-standing doctrine, just like statutory authority claims are reviewable, but they don't say that. The other thing I'll just say quickly, since we're on the subject of that consolidation, Your Honor, the Secretary's conclusion that there might be something unlawful about grouping together the 21 and 23 cohorts reflects a very basic misunderstanding about how TPS works. Of course, you can have designations that come into place at different periods of time, but the designation is for a single country. Venezuela was designated, and to qualify for TPS under the 20-23 designation, you have to have been continuously present in the country and also residing here on a particular date in 20-23, and it was July 31st, 20-23 and October 20-23. Now, the people in the 21 cohort, well, they had to be in the U.S. and continuously residing since some date in 21. I think it was March of 20-21. They're this same group of people. Yes, so by definition, everybody who is eligible under 21 is also eligible under 23, because if you've been here since 21, you've necessarily been here since 23. You can't have left, and so this basic misunderstanding of the Secretary about how the TPS statute works is highly relevant to the APA question. When he says, oh, well, maybe there were some reasons that were unlawful, but there were other reasons that were okay and were You look at the reasons that the agency actually gave, and if there are some reasons that are unlawful, then, you know, you reverse it. That's the sort of basic doctrine. Even the other reason that the Secretary gave, and so I realize we're right now on the second APA claim, right? We're talking about the second APA claim, right? The other reason that the Secretary gave, which was that there may have been confusion caused by the consolidation of registration processes, the district court found as a factual matter, and this is excerpts of record 56 to 60. There's four pages on this claim. The district court found as a factual matter that that rationale was pretextual, and if you look, and now we've got more administrative records, so this will, I assume, be coming here, you know, in some months or something, but there's not a drop of evidence that there was confusion caused by this, and it makes no sense, because two tracks is more than enough evidence that there was confusion caused. Again, we'll just sketch the line out with respect to Ramos, if that's the line. Why wouldn't that cross the line that Ramos drew? Yeah, if that were about country conditions, if we were making that kind of claim about country conditions, it might well be on the other side of the vacated panel majority line in Ramos, but that argument concerns the registration processes and the consolidation of registration processes. That's what we're saying, that the reasons that were given as to registration are not correct, and registration is not addressed in subsection B of the TPS statute. Subsection B is all about the rules for designation, extension, or termination, and then subsection C is about how the agency then provides the benefit to people once it's given a TPS extension. So that's about who's eligible, what the registration processes are. You'll see registration is specifically there in subsection C, and that matters, Your Honor, because the stripping provision is only with respect to claims under this subsection, which is subsection B. It bars review of any determination as to a designation, extension, or termination with respect to this, or I've got the word slightly wrong, but under this subsection, and that is subsection B. So claims that have to do with country conditions, like asylum cases that you all hear all the time, right? We can't come here and say, oh, Venezuela is still oppressive. Venezuela is still in massive economic crisis and still causing, it's still not safe to accept the return of its nationals. Our clients would very much like us to make that claim. It's undoubtedly true, but we cannot make that claim because that that claim is barred. But what's not barred is a claim that the reasons that they gave having to do with registration are arbitrary and capricious, or that they failed to consider alternatives under regions. You know, the other thing is, if this is really true, that there was some confusion, which there is not, but if that were actually true, then they could just deconsolidate the registration processes and make the 21 people do 21 and give the 23 people a different date. But of course, they didn't do that. It was just a pretext to get rid of the entire extension. What about their argument that they just made today about, oh, well, you know, the Supreme Court case split stayed the order, we should just put our hands down and say, you know, reverse? Yeah, I have a few thoughts on that, Your Honor. The first is that the order itself says that it will expire upon somebody seeking cert, or, you know, if they grant it, grant it from an appeal of this or the appeal that we're arguing right now. So if the court thought that there was no way to affirm the district court, then this whole proceeding would be a sham and make no sense. That obviously can't be what they contemplated. What they contemplate is the case will, you know, go back up if, you know, either side seeks cert from whatever this court does now. And that's the first thought. The second thought is, more generally, it's a system of precedent, and they have said again and again and again that their shadow docket orders are not rulings on the merits, and they're not precedent. And so, you know, I don't think that it's sort of proper sort of judicial decision making to, with respect, it's not for me to say, but, you know, my intuition, or my feeling about this subject is, and it makes sense, I think, that you have to only follow law, and there's no law that's made in the order. So there's no way that you can divine a legal rule out of these two paragraphs. So how do you interpret what the last paragraph were? It says this order is without prejudice to any challenge to Secretary Noem's February 3, 2025, Baker-Durr notice, insofar as it purports to invalidate these various things issued with October 2 expiration dates. Thank you, Ron. That was the third thing I was going to say, actually. So the second paragraph of the order suggests that one might be able to bring a claim to protect people who have already had documents issued under the January 17th extension. And we've that, and the court ruled in our favor. So there's a small number of TPS holders now. Excuse me, Your Honor. These are individual claims. No, we did it in this case. We said, and the district court agreed, that all the people, we don't know how many, it's a small number of people, but all the people who did get documents under the January 17th extension can keep their jobs. And depending on what document they got, a very small number of them have protection from detention and deportation. The only reason I bring that up, as your question suggests, that suggests they didn't think there was a subject matter defect. Because if there were a subject matter defect, then presumably this claim, which we now have a separate order, which is not before this court now, but a separate order protecting people from, that too is a challenge to, on their view of determination, if determination is everything related to TPS, and not only the things that actually the Secretary determines in subsection B, which is our position. But if their view is correct, then that claim would also be barred in that second paragraph. The claims in the second paragraph would also be barred. So I don't think that, if we're playing this game of reading tea leaves out of two paragraphs where there's no law in it, I wouldn't think that the answer would be that we should lose on subject matter jurisdiction because of that second paragraph. Could I take you to the framework for the equal protection challenge? I'm just trying to, we've referred to Arlington Heights for some of these pieces. Should we draw any distinction between, so the DACA case, which is Arlington Heights, dealt with a defined population of people. The Hawaii case, I think like this case, deals with the designation of a country. And so I understand that animus is disqualifying whatever standard, and animus is the one irrational basis in constitutional law, but why doesn't that suggest that where we're dealing with a government action, where the classification is really a country as opposed to people, rational basis is where we start. I think the relevant distinction that Hawaii drew is not whether or not the distinction is on a country-by-country basis. I don't think you'll find that in the rationale given for the opinion for why it's applying deferential facial legitimacy. I looked for it when I was trying to understand it, but you're right. Yeah, no, I think what they're saying, they say a few things, but the one which they say, which is most sort of canonical immigration law, is that the claims are on behalf of people who are abroad. Yeah, but the problem there is that it not only doesn't make sense of Matthews, but it also doesn't make sense of all of the rest of rational basis review under Cleburne and Romer and other cases, which, of course, we will apply rational basis to citizens who are bringing equal protection claims. Yeah, absolutely, Your Honor. I think this is a doctrine that most deferential standard of review, which seems to get sort of plopped into certain spots, you know, Moreno and Cleburne are not these sort of historically problematic classifications like racism and or race and gender. They also use it in selective enforcement claims. Now, those might be for people who are in the country, so that seems to, you know, it's not the same as what they're doing in Trump v. Hawaii, but they have used that. The Supreme Court hasn't, but they've sort of blessed the Second Circuit doing that in a case called Raja v. Mukasey, so they treat somebody who's already lost the right to live here, but they're saying, oh, but I'm being targeted because of race. They treat that kind of like the person who's already abroad, so it's ad hoc. I will not find a case involving people who are in the country and particularly lawfully in the country like our population, but even people who are not lawfully in the country, people who are in the country where the Supreme Court has set us to a claim about racial animus that what is to be applied is this very deferential Trump v. Hawaii standard. In fact, I don't believe you'll find a circuit course that says it. We cite the Second Circuit's opinion in United States v. Esquilanda. It's a 1320. I guess on the other side, can we find a case, a Supreme Court case, maybe one of our cases, but let's start with the Supreme Court, in which they've assigned animus to the executive and invalidated an executive action or agency action based on such animus? Um, well, they assume that the standard of review adopted by regents, um, you know, Judge Wardlaw's decision for this court, they assume that Arlington Heights applies in that context. That's one. Another one I would say the... But they rejected the assertion of animus. On the merits. On the merits they rejected because they said the statements are not close in time. They're not about DACA, which is absolutely the opposite of what we have here. Um, the other one I would say, look at the vacated panel decision in Ramos because they considered the same question and also decide that Arlington Heights applies. And then the third one I would say, I agree, this is not a Supreme Court case, but that Second Circuit case, United States v. Esquilanda, which is a 1326 case, the challenge to the illegal reentry statute on the criminal illegal reentry statute on the ground that its, uh, its origins are motivated by racism. And that court considers the government's argument. They made the same argument there. They're making here that because it's sort of immigration policy, you have to apply just generally all immigration policy. You have to apply extremely deferential review. And the court rejects that. And it collects a whole load of cases from across the circuits, various contexts, the public charge challenge, you know, the, the rescission of the public charge program that happened in the first Trump administration, um, and various other contexts. And they say, look, we, this, it is not the law that just because it's immigration, we apply some deeply watered down form of rational basis review. Um, so I think that that's the authority that I would cite for that context. I don't think that yet. I agree that there's not a Supreme court case that squarely decides that question one way or the other. Um, I see my time. How, how does your, how does, what position do you take with respect? How the, to how the secretary could have lawfully, um, terminated the, the TPS status, because I understand your argument. You're saying that allowing the vacatur would contravene, would actually contravene the statute because of these, um, extension periods and termination notice dates and all of that. So what do you think that secretary should have done? Once the designation is in effect, the TPS statute is very clear. It lasts until the end of the extension. So in, um, uh, summer of 2026, uh, that's when it comes up. And I know in this hyper-partisan era that feels like somehow unfair, uh, I suppose to the, to the party that loses the election or that wins the election. But, but Congress wrote the statute, not imagining that, uh, administration should get to play like political hot button, uh, with the lives of so many refugees. That's not the, that's not the statute that Congress wrote. They, they wrote it to create stability. They wrote it against the backdrop of cases like the case they cite, which is over the hotel restaurant workers, DC circuit opinion, which is overruled by the TPS statute. That's the, the TPS statute comes into place and says, it says we're designating El Salvador. Congress designated El Salvador in 1990 in by statute directly overruled that case. But beyond that, they created a regime where there would be some amount of predictability. And that predictability was meant to apply even during times of political change in the, in the process. Um, any other further questions? I know the court wants to talk about appellate jurisdiction at all, um, perhaps not, but. Well, we, we do know we have a, uh, a case that has priority on us before, on the question of appellate jurisdiction. I maybe just say one very brief thing about that. Then in that case, Your Honor, I would just note that in our case, this order just postpones two decisions. That's all it does and reverts us to the last uncontested party, uh, status between the parties, which is the January 17th extension, right? That's, that's all we do. And there's no, it doesn't direct the agency to do anything at all, just postpones these two, two prior ones. But I think this, this case is a 705 case too. Is any, any reason we should distinguish between 705 stays? I think so, actually, because I think it depends on what the underlying administrative process is at the moment when that change happens. So like in, in, uh, that case, and they, they may well be right as well. I don't want, I don't want to sort of throw them under the bus or anything, but, you know, in that case, uh, the MPP program has stopped. And I think that at least the parties argue about whether the effect of that is to require, uh, uh, require them to go back to a position that existed a number of years before. You know, here, what we're talking about was a decision that required the agency to just keep, keep TPS running as it was supposed to be running on January 17th. And then it's the other thing I won't take, I'm taking too much of your time. The only, the last thing I'll say about that is the district court had a long discussion from page 17 to 22 of the excerpts of record about why this order was not injunctive because it was an issue for 1252F, you know, for the other jurisdictional provisions. But depending on the length of the proceedings, couldn't it just end up being dispositive given that we're talking about, uh, temporary relief anyway? Well, here's summary judgment is, maybe this answer your question, or I, the summary judgment hearing on the APA claims is August 1st. Does that answer your question? It gets there. Yeah. So August 1st. So I think there will be rulings very soon. Um, well, they're hearing anyway, very, very soon on the APA claim. Thank you, your honors. Thank you, counsel. I'll give you two minutes to respond. Thank you, your honors. Uh, four quick points. First, they concede that the agency has authority to correct ministerial errors under this TPS statute, and they identified no textual basis that would allow this court to draw a distinction between ministerial errors and policy-based errors. But Mr. Ensign, you say policy-based errors, and I'm not sure I understood your answer to this question. Um, uh, does the secretary, um, is there anything that should suggest to us that the secretary believes that Secretary Mayorkas's order extension was unlawful? Yes, your honor. Where is that in the record and what is that basis? It is in the vacator decision. She specifically said that his prior, uh, order that, quote, the explanation for operational impacts was, uh, thin and inadequately developed, that would render it unlawful. She also pointed to the fact that it would extend designations by up to 13 months. That is not a lawful period under the statute. The statute permits extensions for 6, 12, or 18 months. 13 months is not an allowable choice. Those are both legal errors that were identified in the vacator order, and certainly as to her rationale that the, uh, explanation in the inadequately developed is completely untouched by both the district courts and plaintiffs, and that alone is a sufficient basis to uphold the vacator decision under the APA. Um, actually, if you could answer one of the questions. I, I, I, I understood your, um, answer to my question about the language that was used. Uh, you're suggesting that that was, uh, uh, uh, some time prior to, um, uh, the secretary entering office. It doesn't seem like it was. Was, was that right? Did I understand your answer right? Uh, I, I don't believe so, although it's also possible that I misspoke, Your Honor. I was saying that the, the majority of these statements were made when she was out of office. Because on January the 29th, that's when she made the dirtbag, um, statement. Is that right? Uh, that, that's roughly my understanding, Your Honor, is that... That was after she was the secretary. Yes, that isolated statement was made while she was secretary and was referring specifically to the context of TDA gang members. Those are not warm and cuddly people. The secretary is allowed to express disapproval of gangs that, you know, commit kidnapping, terror, human trafficking within the United States. She might have used colorful language, but that is not a violation of the Eagle Jackson Act. To meet the press interview. I'm sorry, Your Honor. To meet the press interview, but I want to come back to your statement because that's actually incorrect. Her statement was, quote, listen, I was in New York City yesterday and the people of this country, of this country, Venezuela, want these dirtbags out. Your Honor, the, the context around that discussion was previously referring to TDA members. That is not that specific sentence, but the context surrounding that discussion was about TDA members, which is an extraordinarily violent and dangerous gang operating with the United States. I also want to correct that it is not in fact a myth that TDA took over apartment complexes in Colorado. There is a dispute as to how many complexes that was, but it is absolutely not a myth. And I will admit that's not specifically in the record here either way, but like I will tell you from other cases, that is not a myth. That is very, very true. Did the government move to withdraw their TPS status if those, those people had TPS status? Absolutely, Your Honor. But again, that does not supplant Congress's mandate that the Secretary should. You're saying absolutely not. It's an option that they actually acted on that. They exercise the authority that they already have under the statute to address individual cases of criminal conduct by beneficiaries of TPS. That tool continues to exist simultaneously with the Secretary's both authority and simultaneous mandate that she must terminate TPS status when the conditions for it no longer apply. And Counsel, to be fair, reading the entire paragraph of her statement, it does appear she is referring to TDA. Thank you, Your Honor. And that's certainly a point as to that particular statement. And just to be clear as to the timing, I believe it's the case with the President's statements that those were all out of office or prior term. It's the case with Secretary Nome's that the majority or most of those statements were when she was not in office, I will acknowledge. And if I said something contrary, I apologize that that particular comment was when she was in office. But the, you know, unless they're singularly saying that invalidates an entire action, you know, that's the context in which we are before you. If I may just very quickly, you know, they have offered two bases for why rational basis review doesn't apply. And we think that they're rejected by both case laws. They say that it doesn't apply to people that are inside the U.S., but that is squarely contradicted by the Matthews case, which the Supreme Court favorably cited. They say it doesn't apply where there's animus, but that was also, the district court had found animus in Matthews, and the Supreme Court did not modify the rational basis standard to account for it. And then I just, do you agree that we can affirm the district court order if we just reach the first APA claim and decide that the statute does not authorize the vacatur because of the, you know, the monthly provisions and all of that? Do you just agree with that simple proposition? Partially, Your Honor, because there's the antecedent question, of course, as to whether or not the jurisdictional bar applies. But assuming that you had jurisdiction and assuming you thought that they prevailed on an APA arbitrary and capricious challenge, notwithstanding our arguments, that would be a singular basis for affirmance. Because that is a sufficient... I'm saying that she exceeded her, if we just decided she exceeded her statutory authority. If they were to prevail on that particular APA claim and this court had jurisdiction to do so, that would be a basis that could justify the district court's order. We haven't talked about scope either, so I think you would still have the scope questions, both because of CASA and 1252F, and this relief is overbroad. Are you contesting our appellate jurisdiction at all? Not in the slightest, Your Honor. And in fact, this is something that, you know, if you look at their answering brief, they didn't think so. The Supreme Court also seemingly didn't think so. And that's not a court that's insensitive to jurisdictional obstacles. They're, in fact, hyper-attentive to them. And I think there's a tell in their appellate jurisdiction arguments too. If you look at footnote two on page 13, they say, just as the Supreme Court might have had jurisdiction over an original application under Rule 23, so too might this court have jurisdiction to entertain a motion for postponement under Rule 705 if such a motion were denied in the district court. So they're not even... Not only are they not saying that 705 stays aren't potentially appealable, they're carving out a potential asymmetrical rule that they could benefit from. If they don't get a 705 stay, that apparently is appealable. But when you have a 705 stay that operates against the government in a way that's indistinguishable from a preliminary injunction, which was specifically based... Its issuance was based on analysis of the winter preliminary injunction features. I mean, this stay walks, talks, and quacks like an injunction. Mr. Ensign, I wonder just if I could maybe have the benefit of your big picture view in the department. So you raised the CASA question with respect to the universal relief here. What difference is there between the 706 vacator issue that they saved in footnote 10 of that decision and the 705 relief here? Why should we not view the Supreme Court as explicitly not having applied the rationale of CASA to this posture? Your Honor, I think 705 differs from 706 in its language. 706 does have a shell in it, which may be relevant. But in particular, 705 makes clear that it is applying traditional principles. It specifically refers to preventing irreparable harm and maintaining the status quo. Those are quintessential preliminary injunction sort of considerations. CASA is based on traditional equitable principles, and no one disputes that whether or not to grant a Section 05 stay is governed by those same traditional equitable principles that we're controlling in CASA. And so for a Section 705 stay, and the tell in particular is you're using the winter injunction factors to determine whether or not you should do it. There's no question that those winter injunction factors are based on traditional equitable principles. And CASA tells us that under traditional equitable principles, you cannot issue universal relief to non-parties. All right. Thank you, counsel. I gave you two minutes. You took seven and a half. I apologize, Your Honor. Hopefully some of that was useful. Yes. Thank you very much. Thank you, Your Honor. All right. National TPS Alliance versus Nome is submitted, and this session of this court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, MENDOZA, JOHNSTONE